







PRICE

COUNTY OF SAN DIEGO

TB
3:94-CV-01917
*62*
*P/A.*

1 | JOHN J. SANSONE, County Counsel (Acting) (State Bar No. 103060)
County of San Diego
2 | DIANE BARDSLEY, Chief Deputy (State Bar No. 81525)
By RICKY R. SANCHEZ, Deputy (State Bar No. 107559)
3 | 1600 Pacific Highway, Room 355
San Diego, California 92101-2469
4 | Telephone (619) 531-4874

**FILED**

SEP 3

5 | Attorneys for Defendants County of San Diego, Jim Roache, John
6 |     Groff, Steven Clause, Mark Talley and Samuel Sheppard

7

8 | IN THE UNITED STATES DISTRICT COURT

9 | FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10

11 | ANN PRICE, et al.,                    )    No.  94-1917-R(AJB)
                                          )
12 |          Plaintiffs,                 )
                                          )
13 |     v.                               )
                                          )
14 | COUNTY OF SAN DIEGO, et al.,          )    Date:  October 28, 1996
                                          )    Time:  10:30 a.m.
15 |                                      )    Place: Courtroom 5
          Defendants.                     )    Judge: Hon. John S. Rhoades
16 | ─────────────────────────────────────)

17

18

19

20
                  **MEMORANDUM OF POINTS AND AUTHORITIES**
21 |             **IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**
             **BY DEFENDANTS COUNTY OF SAN DIEGO AND JIM ROACHE**
22

23

24

25

26

27

28

62

TABLE OF AUTHORITIES ................................... iii

INTRODUCTION .......................................... 1

STATEMENT OF FACTS .................................... 2

    A.   Law Enforcement Contact ...................... 2

    B.   Medical Examiner's Positional Asphyxia
         Diagnosis Not Based On Medical Evidence ....... 4

    C.   Law Enforcement Employment of the Hogtie
         Restraint .................................... 9

    D.   University of California San Diego Pulmonary
         Study On Hogties and Positional Asphyxia ...... 10

SUMMARY JUDGMENT STANDARD AND THE ADMISSIBILITY OF
EXPERT SCIENTIFIC EVIDENCE ............................ 13

ARGUMENT .............................................. 14

I    THE PLAINTIFF'S CLAIM AGAINST THE COUNTY UNDER
     SECTION 1983 IS WITHOUT MERIT ..................... 14

II   NO CAUSE OF ACTION CAN BE STATED AGAINST SHERIFF
     ROACHE ABSENT A SHOWING OF PERSONAL RESPONSIBILITY . 19

    A.   State Law .................................... 20

    B.   Federal Law .................................. 20

III  THE COUNTY IS ENTITLED TO SUMMARY JUDGMENT ON
     PLAINTIFFS' CAUSE OF ACTION FOR NEGLIGENT HIRING,
     TRAINING, RETENTION AND SUPERVISION ............... 21

# TABLE OF AUTHORITIES

## CASES

Anderson v. Liberty Lobby, Inc.
    477 U.S. 242 [91 L.Ed.2d 202] (1986) ...............    14

Benshoof v. National Gypsum Co.
    978 F.2d 475 (9th Cir. 1992) ...................... 15, 16

Brandon v. Holt
    469 U.S. 464 [83 L.Ed.2d 878] (1995) ..............    21

California Architectural Bldg. Prods., Inc. v. Franciscan
    Ceramics, Inc., 818 F.2d 1466 (9th Cir. 1987) ......    14

Celotex Corp. v. Catrett
    477 U.S. 317 [91 L.Ed.2d 265] (1986) ..............    13

Daubert v. Merrell Dow Pharmaceuticals, Inc.
    43 F.3d 1311 (9th Cir. 1995) .....................14, 16, 18

Farmer v. Brennan
    511 U.S. ___ [128 L.Ed.2d 811, 828] (1994) .........    15

Forrester v. City of San Diego
    25 F.3d 804 (9th Cir. 1994) .......................    15

Gonzales v. State of California
    29 Cal.App.3d 585 (1972) ..........................    21

Hansen v. United States
    7 F.3d 137 (9th Cir. 1993) ........................    13

Kentucky v. Graham
    473 U.S. 159 [87 L.Ed.2d 114] (1985) ..............    21

Lust v. Merrell Dow Pharmaceuticals, Inc.
    96 D.A.R. 8334 (9th Cir. 7/11/96) .................    17

TABLE OF AUTHORITIES

Page

CASES

Lutz v. U.S.
      685 F.2d 1178 (9th Cir. 1982) ......................    15

Michael v. Smith
      188 Cal. 199 (1922) ...............................    20

Monell v. New York City Dept. of Soc. Serv.
      436 U.S. 658 [56 L.Ed.2d 611] (1978) .....15, 16, 19, 21, 25

Newport v. Facts Concerts, Inc.
      453 U.S. 247 [69 L.Ed.2d 616] (1981) ..............    23

Nissho-Iwai American Corp. v. Kline
      845 F.2d 1300 (5th Cir. 1988) ......................    13

Oviatt v. Pearce
      954 F.2d 1470 (9th Cir. 1992) ......................    15

Redman v. County of San Diego
      942 F.2d 1435 (9th Cir. 1991) ......................    24

Reynolds v. County of San Diego
      858 F.Supp. 1064 (D.C. So. Cal. 1994) ..............    1, 22

S.A. Empresa, Etc. v. Walter Kidde & Co., Inc.
      690 F.2d 1235 (9th Cir. 1982) ......................    14

Searcy v. Hemet Unified School Dist.
      177 Cal.App.3d 792 (1986) ..........................    21

Smith v. Wade
      461 U.S. 30 [75 L.Ed.2d 632] (1983) ................    24

Taylor v. List
      880 F.2d 1040 (9th Cir. 1989) ......................    20

TABLE OF AUTHORITIES

Page

CASES

Van Ort v. Estate of Stanewich
    96 Daily Journal D.A.R. 9492 (filed 8/6/96)........ 15, 21

Ward v. City of San Jose
    967 F.2d 280 (9th Cir. 1992) ...................... 24, 25

Ybarra v. Reno Thunderbird Mobile Homes Village
    723 F.2d 675 (9th Cir. 1984) ......................    20


STATUTES


California Civil Code
    Section 52 ........................................    25
    Section 52.1 ...............................1, 21, 22, 23
    Section 3294 ......................................    24
    Section 3294(c)(1) ................................    24
    Section 3294(c)(2) ................................    24

California  Government Code
    Section 815(a) ....................................    21
    Section 818 .......................................    23

California Penal Code
    Section 13503(e) ..................................    10
    Section 13510(a) ..................................    10

Title 42 United States Code
    Section 1983 .................................1, 14, 20

TABLE OF AUTHORITIES

OTHER

American Journal of Forensic Medicine and Pathology
    9(1):16-18 (1988) ................................. 6
    13(2):90-97 (1992)................................ 7

Department of Justice Bill Analysis
    re: Bill No. AB2683, dated 3/1/90 ................. 22

On June 28, 1994, Poway Sheriff's deputies confronted a violent suspect, Plaintiffs' decedent Daniel Price ("Price"), who they placed into a four-point restraint (commonly referred to as a "hogtie"). Price lost consciousness after he was hogtied then died two days later at Pomerado Hospital. The hospital's pulmonary consultant attributed Price's condition to a cardiac arrest due to exertion and methamphetamine ingestion. The Medical Examiner's autopsy report concluded that Price died from positional asphyxia caused by the application of the hogtie. Based primarily on that autopsy report, Price's estate, surviving spouse, two children and parents[1] sue the County of San Diego, former Sheriff Jim Roache, Deputies John Groff, Steven Clause, Samuel Sheppard and Mark Talley for negligence, civil rights violation under Cal. Civ. Code § 52.1, negligent hiring training and supervision, excessive force, and municipal federal civil rights violation under 42 U.S.C. § 1983.

Discovery has revealed that the autopsy report was based on a variety of assumptions regarding the hogtie's physiological effects on respiration which assumptions are not supported by any medical evidence. Since the inception of this case, the University of California San Diego Medical Center has completed a scientific study that conclusively establishes that the hogtie does not cause asphyxia.

///

---

[1]Price's parents have standing to sue only for a Fourteenth Amendment liberty deprivation claim, but not for the state tort of wrongful death because they were not dependent on Price. Robert Price Deposition (Lodged as Exh. 10) 8:23-9:17; Reynolds v. County of San Diego, 858 F.Supp. 1064, 1069 (D.C. So.Cal. 1994).

1   Based on these developments, the County of San Diego and former

2   Sheriff Jim Roache move for summary judgment because, inter alia,

3   there is no scientific evidence to support the proposition that the

4   hogtie restraint causes hypoventilation or asphyxiation.  As a result,

5   there is no basis for claiming that these Defendants were deliberately

6   indifferent to any risk associated with the use of the hogtie

7   restraint as a police tactic.

8       These moving defendants also join into the concurrently filed

9   motion for summary judgment by the defendant deputies.

10                          STATEMENT OF FACTS

11      A.   Law Enforcement Contact.

12      On June 28, 1994, deputies Groff and Clause were dispatched to

13  Tobiasson Street, Poway, to investigate a citizen's 911 call of a man

14  throwing rocks at her house.  (John Groff Deposition (Lodged as Exh.

15  1) "Groff Depo" p. 42, ll 1-9; Steven Clause Deposition (Lodged as

16  Exh. 2) "Clause Depo" p. 29, ll. 10-12.)  Groff and Clause contacted a

17  man, Price, at Tobiasson and Shallman Streets, who matched the

18  caller's description.  (Groff Depo 44:7-9.)  Price told Groff he was

19  fixing his mirror on his truck and pointed to "a friend's house" as

20  his destination, then said "I got to go" and he left and pulled out.

21  (Groff Depo 44:11-12, 44:20-23, 45:8-9.)  Price then drove north on

22  Tobiasson passing the house he told Groff he was going to.  (Groff

23  Depo 45:19-24.)  Groff and Clause elected to further question Price,

24  stopping him at the intersection of Tobiasson and Vaughn.  (Groff Depo

25  46:1-16; Clause Depo 33:6-10.)  There, Price became uncooperative and

26  started fighting with Groff and Clause.  (Groff Depo 53:3-22; Clause

27  Depo 41:5-10.)

28  ///

Without using any neck restraint or impact weapons, and only using OC (pepper) spray, Price was wrestled on the ground for handcuffing. (Groff Depo 56:3-6; Clause Depo 43:17-22.) While on the ground handcuffed, Price repeatedly smashed his face into the pavement and continued to fight and kick. (Groff Depo 56:17-19; Clause Depo 46:24-25, 47:1-4.) Clause called for backup. (Clause Depo 44:25.) Deputies Sheppard and Talley then arrived on the scene. (Clause Depo 47:25; Samuel Sheppard Deposition (Lodged as Exh. 3) "Sheppard Depo" p. 31, ll. 9-16.) Price continued to fight and kick. (Groff Depo 58:9-10; Clause Depo 48:19-20.) Talley retrieved leg shackles from his patrol car, and called for paramedics due to Price's self-inflicted facial injuries. (Groff Depo 58:20-22; Clause Depo 52:21-22; Mark Talley Deposition (Lodged as Exh. 4) "Talley Depo" p. 52, ll. 2-4.) Even after leg shackles were applied, Price continued to kick, (Talley Depo 53-21-25, 54:1; Sheppard Depo 39:11-22) he was then put into a four-point ("hogtie") restraint. This was accomplished by using a second set of handcuffs to connect the chain of the wrist handcuffs to the chain of the leg shackles. (Talley Depo 53:7-10; Sheppard Depo 39:11-22.)

While in the hogtie restraint, Price was in various positions on his left and right flanks and on his stomach. (Talley Depo 55:18-20.) Price struggled against the hogtie restraint. (Talley Depo 56:9-14.) While hogtied, he was first seen to be breathing heavily, followed by shallow breathing corresponding to a cessation of his struggle against the restraint. (Talley Depo 56:18-21.) His pulse was checked and noted to be absent. (Talley Depo 58:1-3; Sheppard Depo 43:10-13.) The hogtie restraint was immediately undone. (Sheppard Depo 44:3-7; Talley Depo 59:19-20.) Simultaneously, paramedics arrived. (Sheppard

Depo 44:19-20, 44:24-25.)  Talley estimates the hogtie restraint was
in place for approximately 3½ minutes, and approximately 70 seconds
used to remove the restraints.  (Talley Depo 54:21-22, 55:3-4, 56:14,
57:12-17, 60:9-13, 60:18-20.)  Plaintiffs' police procedures expert,
Louis Reiter, estimates that the hogtie was applied for no more than 7
or 9 minutes. (Louis Reiter Deposition (Lodged as Exh. 7) "Reiter
Depo" p. 5, 1.13.)  Price was transported to Pomerado Hospital for
emergency care where he died two days later.  (Groff Depo 70:22-24.)

As to Price's resistance and application of the hogtie, it is
undisputed that:  The deputies did not cause Price to act violently.
(Reiter Depo 54:20.)  The deputies appropriately subdued Price.
(Reiter Depo 68:2.)  The deputies appropriately used OC spray and body
weight on Price to overcome his resistance.  (Reiter Depo 53:13;
67:24.)  The hogtie restraint is lawful.  (Reiter Depo 38:25.)  It was
appropriate for the deputies to hogtie Price.  (Reiter Depo 55:25.)

B.    Medical Examiner's Positional Asphyxia Diagnosis
      Not Based On Medical Evidence.

During the course of decedent's treatment at Pomerado Hospital,
the hospital's pulmonary consultant, James S. Otoshi, M.D., opined
that decedent's condition was probably due to a cardiac arrest
resulting from exertion and methamphetamine ingestion.  (James S.
Otoshi, M.D. Report dated 6/28/94 (Lodged as Exh. 18.)  "Otoshi
Report".)  Dr. John Eisele of the Medical Examiner's Office conducted
Price's autopsy and concluded that Price died from positional
asphyxia[2] due to application of the four-point restraint. (John Eisele

_____

[2]Asphyxia is the reduction of arterial blood oxygen levels
with a corresponding increase in arterial blood carbon dioxide
levels beyond normal life sustaining levels. (Reay Depo 15:22-
16:6.)

-4-

Deposition, Vol. II (Lodged as Exh. 8) "Eisele Depo, Vol. II" p. 136, ll. 21-25) Price's body had no anatomical conditions demonstrating positional asphyxia. (Eisele Depo, Vol II, 137:1-10, 138:3-7.) There was also no indication of suffocation.[3] (Donald Reay Deposition (Lodged as Exh. 6) "Reay Depo" p. 14, l.17.) Dr. Eisele disregarded Dr. Otoshi's opinion because Dr. Eisele believed that the amount of methamphetamine found in Price's system was minimal, that is, not of a toxic level typically associated with an overdose diagnosis.[4] (Eisele Depo, Vol II 163:3-6.) Although Dr. Eisele concedes that death might have resulted even without application of the hogtie restraint, he steadfastly opined that the death occurred due to the application of the restraint. (Eisele Depo, Vol. II 219:21-23.) Eighty percent of his opinion was based on the history of the event from one police report and a Sheriff's detective's oral description to him of the incident. (Eisele Depo, Vol. II 141:17-23, 159:1-8.) Fundamental to his diagnosis is his reliance on articles by plaintiffs' expert Dr. Donald Reay, Chief Medical Examiner for King County, Washington, which suggest hogtying causes positional asphyxia, although no scientific data shows the two to be directly connected and plaintiffs have no epidemiological (human statistical) studies regarding the frequency of

---

[3]Suffocation is the occlusion of the external orifices of the airway. (Reay Depo 14:13-17.)

[4]Without exception each of plaintiffs' expert physicians have testified that methamphetamine's lethality is unassociated with any particular amount. (Reay Depo 44:13-17; Robert MacFarlane Deposition (Lodged as Exh. 9) "MacFarlane Depo" p. 16, ll. 6-17; 57:1-58:15.)

1 | the hogties' use and occurrence of death. (Eisele Depo 145:3-24,
2 | 147:4-7; 149, 158:7-1; Reay Depo 79:16-17.)

3       According to Dr. Reay, physical exertion, such as fighting with
4 | police, reduces blood oxygen levels. (Reay Depo 16:7-16.)
5 | Thereafter, the strain of tying a person's wrists to his ankles behind
6 | the back to achieve the hogtie position arches the person's back and
7 | stretches the chest and abdomen. (Reay Depo 13:6-25, 25:13-26, 49:8-
8 | 18.) This keeps the chest and abdomen from fully expanding, thus
9 | preventing deep breathing which in turn reduces the blood's oxygen
10 | supply. (Reay Depo 13:6-25, 25:13-26, 49:8-18.) When a hogtied
11 | person is left on his stomach, body weight flattens the chest and
12 | restricts diaphragmic movement by pressing the stomach up against the
13 | diaphragm making breathing difficult, thus reducing ventilatory
14 | capacity. (Reay Depo 13:6-25, 25:13-26, 49:8-18.) The combined
15 | effect of exertion, the reduction of ventilatory capacity induced by
16 | the hogtie and prone positioning is thus said to reduce the oxygen
17 | level of the blood that feeds the heart, which in turn causes the
18 | heart to experience a dysrhythmia,[5] thus resulting in death by
19 | asphyxiation. (Reay Depo 13:6-25, 25:13-26, 49:8-18.)

20      Dr. Reay reported his hypotheses regarding the relationship
21 | between asphyxia and the hogtie restraint in two articles: the first
22 | entitled "Effects of Positional Restraint on Oxygen Saturation and
23 | Heart Rate Following Exercise," The American Journal of Forensic
24 |
_____

25      [5]Quite significantly, Dr. Eisele reticently acknowledges
26 | that there is no empirical evidence that the hogtie precipitates
cardiac events, and in his estimation, there is less than a one
27 | percent probability that the hogtie restraint would precipitate a
cardiac arrest. (John Eisele Deposition "Eisele Depo," Vol. II,
28 | p. 145, ll. 9-11; 147:1-12.)

Medicine and Pathology, 9(1):16-18 (1988), and a second entitled
"Positional Asphyxia During Law Enforcement Transport," The American
Journal of Forensic Medicine and Pathology, 13(2):90-97 (1992).
Although Dr. Reay's articles report on pulmonary gas exchange issues,
he has never considered such matters. (Reay Depo 66:10-22.) In
conducting his experiment, he was not concerned with accuracy. (Reay
Depo 81:7-11.)[6]

In Dr. Reay's first article, he reported the results of an
experiment he conducted using a pulse oximeter machine to monitor
blood oxygen saturation levels which purported to show that
oxygenation levels decreased after exercise and placement in the
hogtie position. However, by Dr. Reay's concession, that experiment
was crude and perhaps flawed. (Reay Depo 80:2, 81:7-23, 26:5-7.) His
experiment neither demonstrated that asphyxia was induced by the
hogtie restraint, nor did he make any such conclusion in his first
article. (Reay Depo 18:18.) He made that conclusion in his second
article which was not supported by any new experimental data. (Reay
Depo 18:23.) His experiment did not make any findings as to the
levels of carbon dioxide generated by individuals in the hogtie
position after exercise and his conclusion that hypercapnia results
from the hogtie restraint was only a surmise and not a measured
consequence of any experiment or study. (Reay Depo 20:5, 20:12.) His
experiment generated no spirometry data as to affects of the hogtie on
ventilatory capacity, i.e., the flows and volume of air in and out of

_____

[6]Based on Dr. Reay's testimony, it is evident that the
methodology of his experiment was not subject to validation or
review by scientists specializing in pulmonary medicine as a
condition to publication.

-7-

a person's lungs, although such data is pertinent to his hypotheses. (Reay Depo 25:13-23.)[7] His conclusion that there is a restriction of ventilation which adversely affects pulmonary gas exchange function was a surmise. (Reay Depo 25:22-26:25.)

Dr. Reay acknowledges that Julius H. Comroe's text book entitled "Physiology of Respiration" is authoritative. (Reay Depo 62:2.) As blood oxygen saturation increases there is a corresponding increase in the pressure of oxygen." (Reay Depo 64:13-15.) Pressure of oxygen "PO2" measurements are more reliable in assessing physiology of body fluids than oxygen saturation by pulse oximetry. (Reay Depo 23:14.) In measuring blood gas, use of arterial blood would be more accurate than pulse oximetry and a study using arterial blood would be superior to his experiment which was non-invasive and so did not use arterial blood samplings. (Reay Depo 80:12-21.) Reay agrees with Comroe's text that with exercise the pressure of carbon dioxide "PCO2"[8] decreases and the PO2 increases. (Reay Depo 65:11-13, 66:2-9.) He is unable to account for why in his study and articles he reports just the opposite. (Reay Depo 66:10-22.) However, considering the articles regarding the inaccuracy of pulse oximetry in measuring blood oxygen levels, Dr. Reay admits that his study was perhaps flawed. (Reay Depo 81:7-23.) If with exercise oxygen levels remain level or
///

---

[7]In fact, Dr. Reay does not even know how to measure ventilatory capacity. (Reay Depo 86:5-8.)

[8]PCO2 is the concept used to accurately measure blood carbon dioxide levels and is the best measurement of the adequacy of ventilation.

increase (as set forth in Comroe's text), it cannot be concluded that the hogtie precipitated positional asphyxia. (Reay Depo 54:15-20.)

        C.    Law Enforcement Employment of the Hogtie Restraint.

In June 1992, the City of San Diego Police Department "SDPD" issued the "Final Report of the Custody Death Task Force" (Lodged as Exh. 19) ("Task Force Report"). Relying on Reay's articles, SDPD proclaimed its abandonment of the hogtie restraint when transporting suspects. (Task Force Report pp. 6, 12.) The Task Force report was forwarded to and received by the San Diego County Sheriff's Department. (Jim Roache Deposition (Lodged as Exh. 11) "Roache Depo" p. 9, ll. 4-10.) Former Sheriff Roache ordered the Task Force Report analyzed for its possible impact on Sheriff Department operations. (Roache Depo 31:9-23.)

Prior to Price's June 28, 1994, incident, and contrary to SDPD's proclamation, the Sheriff's Department did not abandon use of the hogtie restraint, nor did it provide any training which informed the defendant deputies that the hogtie restraint could cause positional asphyxia. (Roache Depo 27:12-14, 52:16-20; Thomas Snowden Deposition (Lodged as Exh. 12) "Snowden Depo" p. 31, ll. 18-25, 32:1-25, 33:3-6.) Whether the hogtie restraint actually could induce asphyxia was unresolved in the Sheriff's perspective since the physiological effects of the restraint were not fully investigated; as Sheriff Roache pointedly testified, "I felt that the Task Force Report lacked some scientific foundation to validate the conclusions reached by the committee." and "I was troubled by the lad of validation." (Roache Depo 29:25-30:2, 30:21-22.) As of May 1995, not even the California Department of Justice's Commission on Peace Officer Standards and Training ("POST") had promulgated any training or training measures

pertaining to the hogtie restraint and positional asphyxia. (Reiter Depo 35:19.)  POST promulgates standards and training to enhance effective law enforcement services.  Cal. Pen. Code §§ 13503(e), 13510(a).  Plaintiffs have no information as to the number of law enforcement agencies in the State of California that have abandoned the use of the hogtie restraint.  (Reiter Depo 34:10-13.)  Plaintiffs have no information as to the number of law enforcement agencies in the County of San Diego that presently use the hogtie restraint or whether any have abandoned use of it  (Reiter Depo 34:19-35:1.)[9]

> D.   University of California San Diego Pulmonary Study
>      On Hogties and Positional Asphyxia.

Using grant funds provided by the County of San Diego and the National Institutes of Health, a team of UCSD Medical Center physicians conducted an experiment to ascertain the effects of the hogtie restraint on pulmonary gas exchange function.  (Thomas Neuman, M.D. Deposition (Lodged as Exh. 5) "Neuman Depo" p. 12, ll. 3-9.)  The methodology, experimental findings and conclusions of the UCSD experiment are set forth in the paper entitled "Restraint Position and Positional Asphyxia" (Lodged as Exh. 13) ("RP&PA") which is to be submitted for publication with the Journal of the American Medical

---

[9]Although plaintiffs' police procedures expert has no opinion on whether Dr. Reay's hypothesis that the hogtie restraint causes asphyxia is accurate, in rendering his opinion that the County, by failing to follow SDPD's lead, was deliberately indifferent to the risks of the restraint he assumes that Reay's hypotheses are correct. (Reiter Depo 22:11, 46:4.)

If the assignment of the risk to the restraint technique is wrong, that is, there is no scientific or medical basis for the assignment of the risk, then he and opponents of the hogtie restraint are being led by "charlatans". (Reiter Depo 23:4-17.)

Association.  (Neuman Depo 15:19-22; RP&PA.)  Based upon the findings
of that study, the authors of the article, including Thomas Neuman,
M.D., conclude that ". . .there is no evidence that body position
while in the 'hogtie' or 'hobble' restraint position causes
hypoventilation or asphyxiation."  (Neuman Depo 55:12-13; RP&PA p.
12.)

UCSD's study on the subject revealed that Dr. Reay's work on
hogtying and asphyxiation suffered from three fundamental errors.
First, Dr. Reay did no spirometrical assessment of his subjects.  He
therefore had no foundational basis upon which to say how much the
hogtie restraint interferes with ventilation (breathing) or whether
the restraint had any impact of blood gas exchange.  Second, Reay
reported that oxygen saturation dropped with exercise.  He could not
explain this anomaly which is inconsistent with Comroe's medical text
book on respiratory physiology which teaches arterial blood oxygen
levels actually increase with exertion.  Third, although Dr. Reay
acknowledged that arterial PO2 measurements are the only accurate way
to ascertain true oxygen saturation levels, he never measured arterial
PO2 levels in the subjects he used to illustrate his hypotheses, but
rather relied on the highly inaccurate pulse oximeter.  (RP&PA p. 10-
11; Neuman Depo 11:6-13:21.)

The UCSD Medical Center study did spirometry, arterial
saturation, arterial PO2, and arterial PCO2 measurements on 15 normal
males whose body mass index included Price's body mass index. (Neuman
Depo 31-32, 39:5-8; RP&PA pp. 4-6.)  The experiment's design and
protocol were reviewed and approved by the Human Subjects Committee of
the University of California, San Diego. (Neuman Depo 15:10-13; RP&PA
pp. 4-6.)

The study demonstrated the effect the hogtie on ventilation through spirometry measurements. (Neuman Depo 31-32.) As compared to the unencumbered sitting position, forced vital capacity "FVC" is reduced by 6.8% when lying on one's back, 7.3% when lying on one's stomach, and 13.3% in the hogtie position. (RP&PA p. 7.) Notably, FVC increased by 3% while in the hogtie position after exercise. (Neuman Depo 37:14-23; RP&PA p. 7.) These changes are not, however, of any clinical import because there is no interference with pulmonary gas exchange function and the measurements remained within normal range. (Neuman Depo 35-36, 50.)

The study demonstrated the effects of exercise and the hogtie on pulmonary gas exchange measuring arterial PO2 and PCO2 before and after exercise and during rest in the sitting and restraint positions.(Neuman Depo 34-38.) Sitting position: Before exercise, the subjects had a base PO2 of 91.4, and base PCO2 of 38.5.[10] (RP&PA p.8.) After 4 minutes of exercise, PO2 levels increased to 108.7, and PCO2 fell to 34.5. (RP&PA p. 8.) After 1.5 minutes of post-exercise rest, PO2 levels elevated even further to 122.7, and PCO2 fell even further to 31.3. (RP&PA p. 8.) After 15 minutes of rest, PO2 levels fell back towards normal to 102.4, and PCO2 rose back towards normal to 32.9. (RP&PA p. 8.) An increase in PO2 shows there is an increased amount of oxygen in arterial blood. (Neuman Depo 34.) PCO2 indicates ventilatory efficiency. (Neuman Depo 41:16.) An increase in PCO2 corresponds to impaired ventilation. (Reay Depo 49:23-50:1.) The hogtie restraint: Using the PO2 and PCO2 levels after 15 minutes of

[10]All blood gas measurements are in mmHg. The raw data showing the recited measurements are contained in Exhibits 3 and 6 of Neuman's Depo.

rest after the subjects' initial phase of exercise as a base, after an
additional 4 minutes of exercise, PO2 levels rose from 102.5 to 109.8,
and PCO2 fell from 32.9 to 30.7.  (RP&PA p. 8.)  Immediately after
each subject stopped their second phase of exercise, each was placed
into the hogtie (which took an average of 1.5 minutes following the
cessation of exercise).  PO2 was measured at that time and found to
have risen even further to 114,  PCO2 was measured at 31.  (RP&PA p.
8.)  After 15 minutes in the hogtie, PO2 fell back towards normal to
99.1, and PCO2 rose towards normal to 32.7.  (RP&PA p. 8.)  The post-
exercise hogtie results are substantially the same as the results
obtained from measurements following rest after exercise without any
restraint.  (See prior 1st phase exercise results above.)
Importantly, PCO2 was not significantly different in the sitting and
hogtie positions.  (Neuman Depo 42:11-18.)

## SUMMARY JUDGMENT STANDARD AND THE
## ADMISSIBILITY OF EXPERT SCIENTIFIC EVIDENCE

Summary judgment serves to isolate and dispose of factually
unsupported claims.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-324
[91 L.E.2d 265] (1986).  Federal Rules of Civil Procedure, rule 56(e)
requires plaintiffs as the non-moving parties to go beyond the
pleadings and by affidavits, depositions, answers to interrogatories,
etc., designate "specific facts showing that there is a genuine issue
for trial."  Celotex Corp., 477 U.S. at 323-324.  Generalized
references to evidence are insufficient.  Hansen v. United States, 7
F.3d 137, 138 (9th Cir. 1993); Nissho-Iwai American Corp. v. Kline,
845 F.2d 1300, 1307 (5th Cir. 1988).  Summary judgment cannot be
defeated by reliance on one's pleadings.  Celotex Corp., 477 U.S. at
323-324.  Genuine issues of material fact sufficient to overcome

defendants' motion for summary judgment cannot be created simply by making argumentative assertions in legal memoranda. S.A. Empresa, Etc. v. Walter Kidde & Co., 690 F.2d 1235 (9th Cir. 1982). To withstand a motion for summary judgment, the non-moving party must show that there are "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 [91 L.Ed.2d 202] (1986). If the factual context makes the non-moving party's claim implausible, the party must come forward with more persuasive evidence than would otherwise be necessary to demonstrate that there is a genuine issue for trial. California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468,(9th Cir. 1987) cert. denied, 484 U.S. 1006, (1988).

Summary judgment must be entered in cases where the plaintiffs fail to adduce enough admissible evidence to create a genuine issue of material fact on causation. Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1315 (9th Cir. 1995). If, in this case, the expert scientific evidence plaintiffs proffer to prove that the hogtie restraint causes positional asphyxia is excludable at trial because it does not qualify as reliable "scientific knowledge", then summary judgment should be granted. Daubert, 43 F.3d at 1315.

ARGUMENT

I

THE PLAINTIFF'S CLAIM AGAINST THE COUNTY
UNDER SECTION 1983 IS WITHOUT MERIT

Where "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said

to represent official policy, inflicts [a constitutional] injury, then the government as an entity is responsible under § 1983." Monell v. New York City Dept. of Soc. Serv., 436 U.S. 658, 694 [56 L.Ed.2d 611] (1978). "Four conditions . . . must be satisfied in order to establish municipal liability for failing to act to preserve constitutional rights: '(1)that the plaintiff possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.'" Oviatt v. Pearce, 954 F.2d 1470, 1474 (9th Cir. 1992) (Oviatt), quoting Canton, 489 U.S. at 389-91." Van Ort v. Estate of Stanewich, et al., 96 Daily Journal D.A.R. 9492, 9493 (filed 8/6/96).[11]

   To act with deliberate indifference is the equivalent of recklessly disregarding a substantial risk of harm. Farmer v. Brennan, 511 U.S. ___ [128 L.Ed.2d 811, 828] (1994). Actual causation is a necessary element as ..."Congress did not intend § 1983 liability to attach where such causation was absent." Monell, 436 U.S. at 692. Although causation is typically a jury question, it becomes a question of law when the available evidence allows only one conclusion or when the evidence is insufficient to establish causation. Lutz v. U.S., 685 F.2d 1178 (9th Cir. 1982); Benshoof v. National Gypsum Co., 978

---

[11]The first step in plaintiffs' Monell claim is to prove that the defendants violated plaintiffs' constitutional rights by using excessive force in subduing Price during the June 28, 1994, incident. If this Court rules in connection with the individual defendant deputies' summary judgment motion that there was no excessive force used on Price, plaintiffs' Monell claim against the County becomes moot. Forrester v. City of San Diego, 25 F.3d 804, 808 (9th Cir. 1994).

F.2d 475, 476 (9th Cir. 1992) "[W]hen a plaintiff's evidence 'does not establish a causal connection, leaving causation to the jury's speculation, or where reasonable persons could not differ on the inference derived from the evidence,' should the court remove this question from the jury." Benshoof, 978 F.2d at 476.

Plaintiffs' Monell claim is premised on the contention that the County, by failing abandon use of the hogtie restraint and not training its deputies about the restraint's ability to cause positional asphyxiation, was deliberately indifferent to a substantial risk of harm that could be imparted to persons on whom the restraint is applied. Plaintiffs' contention supposes above all else that the restraint does in fact cause asphyxiation. There is, however, absolutely no medical evidence to support the supposition that the hogtie restraint causes asphyxia.

To be admissible as evidence, expert scientific testimony must reflect scientific knowledge having been derived by the scientific method such as to amount to good evidence, and advance a material aspect of the case. Daubert, 43 F.3d at 1315. In determining whether the scientific evidence is reliable the courts consider a multitude of factors such as whether the expert is testifying about a matter within his expertise, whether the expert's theory is generally accepted within the scientific community, whether the expert's methodology for any experiment utilized to advance his opinions was generally accepted in the scientific community, whether the expert's findings were subject to peer review for validation, and whether the expert's opinion is based on work with a known or potential rate of error which is acceptable. Id. at 1315.

///

-16-

Plaintiffs do not have any admissible expert scientific testimony to prove the hogtie causes positional asphyxia. Plaintiffs' expert on causation is Dr. Reay, a medical examiner, not a respiratory physiologist, who renders an opinion pertaining to pulmonary functions, but who does not even claim that he has a working understanding of the material set forth in Comroe's text on the "Physiology of Respiration". (Reay Depo 61:17-24, 88:14.) He last worked as a physician with live persons in 1969. (Reay Depo 40:15.) In conducting his hogtie experiment he measured blood oxygenation levels through pulse oximetry, a method fraught with error potentials of which he was not even aware. (Reay Depo 80:22-82:15.) He does not know whether the pulse oximeter machine he used was calibrated. (Reay Depo. 57.) He did no pre-experiment examinations of the experiment participants to determine whether they were of normal lung functioning so to assure proper experiment results. (Reay Depo 59:20-23.) His experiment's oximeter readings did not account for the effects of carboxyhemoglobin, a compound found in smokers, although some of the participants were smokers. (Reay Depo 59:9-14.) Although arterial blood sampling is the most accurate means by which to measure blood gas content he never used this technique. He never obtained $CO_2$ measurements of any kind. He never obtained spirometry measurements. He never obtained $PO_2$ measurements. He cannot explain the anomalous findings and conclusions of his experiment that oxygen saturation levels decreased with exercise although an authoritative medical text is to the contrary. His opinion is inadmissible. Lust v. Merrell Dow Pharmaceuticals, Inc., 96 D.A.R. 8334, 8336 (9th Cir. 7/11/96). He does not contend that his experimental methodology on asphyxia has ever been subjected to peer review. In fact as of the date of his

-17-

deposition he had never been confronted with or considered the pulmonary gas exchange issues presented to him in his deposition. (Reay Depo 66:10-22.) Dr. Reay most certainly does not contend that the methods he used in his experiment were anything but crude. In the final analysis, Dr. Reay's opinion is but an amalgam of suppositions and surmises. Without the benefit of any scientific data he surmised that the hogtie adversely affects pulmonary gas exchange function, and causes hypercapnia, hypoxia, hypoventilation, and asphyxia.

Juxtaposed to Reay's "crude" experiment, the University of California San Diego conducted a study which satisfies all the protocols of Daubert albeit having arisen in the litigation context. The study was funded in part by a grant to UCSD from the County. These funds were not paid to Dr. Neuman. Four University pulmonary physicians cooperated in producing the report which was based on an experiment whose methodology was validated by peer review through the University's human use committee. The data generated by the experiment cannot therefore be reasonably said to have been influenced by a litigation driven financial incentive.

The results the UCSD study clearly demonstrate that asphyxiation does not occur during exertion or while hogtied. It further shows that the Medical Examiner's diagnosis of positional asphyxia due to application of the hogtie is not scientifically tenable and that plaintiffs have no admissible scientific expert testimony to support causation. The hogtie did not asphyxiate Price.

Before UCSD did the positional asphyxiation study, no controlled study had ever been done to confirm or disaffirm Dr. Reay's

hypotheses.[12]  His conclusions were simply accepted as true by the City of San Diego, which banned use of the hogtie because of its asphyxiation potential.  The Sheriff's Department was aware of the City's ban on hogties, but did not follow suit.  Thus rose the spectre that the Sheriff's Department was deliberately indifferent to an obvious risk of death or serious bodily injury.  The UCSD Medical Center study exposes the fallacy of Dr. Reay's hypotheses and the inadmissibility of his expert opinion regarding causation.

That the County did not act upon Dr. Reay's erroneous suppositions regarding the dangers of the hogtie restraint, but rather continued to use the restraint, neither created nor presented any unreasonable risk of harm to citizens.  Because the restraint does not cause hypoventilation, hypercapnia, hypoxia or asphyxia, there was no attendant risk of injury.  As a matter of law, the County was not deliberately indifferent to any harm presented by its use. Plaintiffs' case fails because there is no admissible proof that the hogtie restraint causes positional asphyxia.  As a matter of law, the County is entitled to summary judgment on plaintiffs' Monell claim.

II

NO CAUSE OF ACTION CAN BE STATED AGAINST SHERIFF
ROACHE ABSENT A SHOWING OF PERSONAL RESPONSIBILITY

Under state and federal law there is no vicarious liability

_____

[12]Up until UCSD's study, no study has ever been conducted on the actual pulmonary effects of the hogtie. (Reay Depo 61:13, 79:16-19.)  No one until now, in the scientific community has deemed Dr. Reay's first article and experiment worthy of validation.  It is as though there was a tacit understanding that what has been occurring relative to the hogtie/positional asphyxia controversy has been litigation and not science.  cf. Daubert, 43 F.3d at 1318.

against public employees. Since plaintiffs cannot show facts indicating they incurred any injury as a result of Sheriff Roache's personal conduct, the Sheriff is entitled to summary judgment on all causes of action.

A. State Law.

Under state law, the doctrine of respondeat superior is inapplicable to public servants. Cal. Gov't Code § 820.8. Section 820.8 states:

> "Except as otherwise provided by statute, a public employee is not liable for an injury caused by the act or omission of another person. Nothing in this section exonerates a public employee from liability for injury proximately caused by his own negligent or wrongful act or omission."

Without question, neither the head of a law enforcement agency nor co-employees, are responsible for acts of subordinates or co-workers:

> "A public officer is not responsible for the acts or omissions of subordinates properly employed by or under him, if such subordinates are not in his private service, but are themselves servants of the government, unless he has directed such acts to be done or has personally co-operated therein." Michael v. Smith, 188 Cal. 199, 201 (1922).

B. Federal Law.

It is well-recognized in section 1983 jurisprudence that there is no respondeat superior liability. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). A superior cannot be held personally liable under section 1983 for constitutional deprivations allegedly caused by his subordinates absent his participation or direction in the alleged deprivation. Ybarra v. Reno Thunderbird Mobile Homes Village, 723 F.2d 675, 680 (9th Cir. 1984). Accordingly, Sheriff Roache is entitled to summary judgment on all of plaintiff's claims because ///

there is no evidence to show that the Sheriff personally inflicted, by deed or decision, any injury on plaintiffs.[13]

### III

#### THE COUNTY IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CAUSE OF ACTION FOR NEGLIGENT HIRING, TRAINING, RETENTION AND SUPERVISION

In California all tort liability against a public entity is dependent on the existence of an authorizing statute. Searcy v. Hemet Unified School Dist., 177 Cal.App.3d 792, 802 (1986); Gonzales v. State of California, 29 Cal.App.3d 585, 590 (1972); Gov't Code, § 815(a). There is no statutory authority for plaintiffs' cause of action against the County for negligent hiring, training, supervision and retention. Given the absence of any statutory authority pertaining to the direct imposition of liability on the County for negligent hiring etc., plaintiff's cause of action fails because it is not authorized by law. Van Ort, 96 DAR at 9496-9497.

### IV

#### PLAINTIFFS CANNOT MAINTAIN A SEPARATE CLAIM UNDER CALIFORNIA CIVIL CODE SECTION 52.1

A.   No Substantive Rights Are Conveyed by Section 52.1.

Plaintiffs' first amended complaint at paragraph 8 on page 3 of form 1A-5, alleges violation of Cal. Civ. Code § 52.1. Yet plaintiffs

---

[13]If plaintiffs have named Sheriff Roache because of his official capacity, then this is not a lawsuit against him personally, but rather his office. As such it is no different than a lawsuit against the governmental entity for whom the official acts. See Brandon v. Holt, 469 U.S. 464, 471 [83 L.Ed.2d 878] (1985); Kentucky v. Graham, 473 U.S. 159, 165-166 [87 L.Ed.2d 114] (1985); Monell, 436 U.S. at 690 n. 55. Thus, Sheriff Roache would be a superfluous party since the County is already a defendant.

do not allege any conduct by defendants that would constitute a violation of the state constitution but not the federal constitution. "Section 52.1 does not provide any substantive protections; instead it enables individuals to sue for damages as a result of constitutional violations." Reynolds, 84 F.3d at 1170. Absent proof that defendants violated a state constitutional right separate from those accorded by the federal constitution, there is no basis for imposing liability. Id. at 1170

B.   Section 52.1's Legislative History Precludes
     Governmental Liability.

Cal. Civ. Code § 52.1 does not even apply to, nor was it ever intended to apply to, public employees or entities for alleged violations of civil rights resulting from police activity. Since § 52.1 was enacted in 1987, not one reported decision has ever held that a plaintiff may bring an independent action under § 52.1 against police officers or their employers. The purpose of § 52.1 is to give victims of so-called "hate crimes" a remedy against groups such as the Ku Klux Klan, who attempted to terrorize individuals in fear of hate violence by way of "threats, intimidation, or coercion." (Department of Justice Bill Analysis, re: Bill No. AB2683, dated 3/1/90 (Lodged as Exh. 14).[14]

Despite repeated attempts by lobbyists to add a "damages" remedy to the bill and to delete from the bill the words "threats,

---

[14]This exhibit, like Exhibits 15, 16, and 17, were obtained from the official records of the California Assembly and California Senate, and are true and correct copies of documents contained in the enactment history of Chapter 392, statutes of 1990, Assembly Bill 2683 -- Floyd, amending Cal. Civ. Code § 52.1.

intimidation, or coercion" so as to make proposed § 52.1 "akin to section 1983", (Letter to Melissa Nappan, CACJ Legislative Office dated 9/21/89 (Lodged as Exh. 15). The bill retained its limiting language. The ACLU was against deletion of the phrase "threats, intimidation or coercion". (Letter to Assemblyman Richard E. Floyd from ACLU Legislative Director and Legislative Advocate to Assemblyman, dated 3/1/90 (Lodged as Exh. 16). The California Department of Justice was concerned that deletion of the phrase "threats, intimidation or coercion" would make the section an "alternative cause of action in virtually every tort action." When the bill, with § 52.1 set forth in its present form, was through the Legislature, its sponsor Assemblyman Richard E. Floyd wrote to Governor Deukmejian urging him to sign it, stating: "this bill does not change the scope of our civil rights law . . . ." (Letter to Governor George Deukmejian from Assemblyman Richard E. Floyd, dated 7/9/90 (Lodged as Exh. 17.)

Section 52.1 does not provide an independent statutory remedy against police officers or public entities. It was proposed and passed as an anti-hate crime statute and this court should refuse plaintiffs' invitation to extend its application to governmental conduct.

V

DEFENDANTS ARE NOT LIABLE FOR PUNITIVE DAMAGES

As a matter of law, the County cannot be held liable for punitive damages. Newport v. Facts Concerts, Inc., 453 U.S. 247 (1981) [69 L.Ed.2d 616]; Cal. Gov't Code § 818. As to former Sheriff Jim Roache, there is no evidence that he personally engaged in any conduct which ///

could subject him to punitive damage liability under state or federal law.

Under Cal. Civ. Code § 3294, punitive damages may be awarded only where a defendant is guilty of oppression or malice. "'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." Cal. Civ. Code § 3294(c)(1). "'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." Cal Civ. Code § 3294(c)(2).

Under federal law, punitive damages are considered proper only when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others. Smith v. Wade, 462 U.S. 30, 56 [75 L.Ed.2d 632] (1983). "Evil motive" is clearly despicable; needing no elaboration. "Reckless indifference," is remarkably similar in definition to section 3294's definitions of malice and oppression: reckless indifference is "conduct that is so wanton or reckless with respect to the 'unjustified infliction of harm as is tantamount to a knowing willingness that it occur, '. . . it is conduct equivalent to a deliberate choice." Redman v. County of San Diego, 942 F.2d 1435, 1443 (9th Cir. 1991). "Reckless" is also found to be synonymous to wanton. (Id. at fn. 10.) In Ward v. City of San Jose, 967 F.2d 280, 286 (9th Cir. 1992) the district court relied on § 3294's language in granting the defendant officers a directed verdict on punitive damages. The appellate court upheld the directed verdict stating: "There is absolutely no evidence, however, that the officers acted

-24-

1 with evil intent." Ward, 967 F.2d at 286.

2     Under federal or state law, there is absolutely no evidence that

3 former Sheriff Roache's actions in response to the hogtie/positional

4 asphyxia controversy was ill advised, let alone of the unsavory nature

5 required for punitive damage liability. His refusal to act

6 impulsively and his conviction that the Task Force Report's criticism

7 of the hogtie restraint lacked validation have been vindicated by

8 UCSD's study which scientifically establishes that the restraint is

9 innocuous. He is entitled to a judgment of non-liability for punitive

10 damages.

11                     CONCLUSION

12     Based on the foregoing, defendants County and Jim Roache

13 respectfully request that this Court issue an order granting summary

14 judgment as follows: Plaintiffs' Monell claim premised on the

15 defendants' alleged deliberate indifference to the asphyxiation

16 dangers of the hogtie restraint is without merit because there is no

17 evidence that the restraint causes hypoventilation or asphyxiation;

18 There is no factual basis for imposing personal liability on former

19 Sheriff Jim Roache; Plaintiffs' state law action under Cal. Civ. Code

20 § 52 cannot support any claim of liability; There is no basis for

21 imposing liability on defendants for negligent hiring, training and

22 supervision.

23 DATED: Sept 3/96     Respectfully submitted,

24                         JOHN J. SANSONE, County Counsel (Acting)
                        DIANE BARDSLEY, Chief Deputy

25

26                         By
                          RICKY R. SANCHEZ, Deputy
                        Attorneys for Defendants County of San Diego,

27                         Jim Roache, John Groff, Steven Clause,
                        Mark Talley and Samuel Sheppard

28